UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KATHY HANFLAND,

Plaintiff,

Case # 10-CV-6106-FPG

v.

DECISION & ORDER

MEGAN BRENNAN,[1] POSTMASTER GENERAL,
UNITED STATES POSTAL SERVICE,

Defendant.

## BACKGROUND

### 1.  Undisputed Facts[2]

Plaintiff Kathy Hanfland ("Plaintiff") began working full time for the United States Postal Service ("Postal Service") in 2006.  She is currently employed as a Mail Processing Clerk at the Rochester, New York Logistics and Distribution Center ("L&DC")[3] on Lyell Avenue in Rochester, New York.

At the heart of this case is an ongoing dispute between Plaintiff and co-worker Tanya Binnert ("Binnert"), another Mail Processing Clerk who was hired at the same time as Plaintiff. The dispute began soon after Plaintiff and Binnert began working together, and in August 2007 Plant Manager David Bianchi ("Bianchi") and Supervisor Anthony Frosino ("Frosino") held separate meetings with Plaintiff and Binnert in which both Plaintiff and Binnert were ordered to keep their distance from each other and not discuss each other with their co-workers.

---

[1]     Postmaster Megan Brennan is substituted for Patrick R. Donahoe pursuant to Fed. R. Civ. P. 25(d).
[2]     Except as otherwise stated, the following facts are taken from the parties' respective Local Rule 56 Statements (ECF Nos. 55-1, 64).
[3]     The L&DC was renamed the Northwest Rochester Processing and Distribution Center in 2014, but will still be referred to as "L&DC" in this decision for the sake of consistency.

On January 29, 2008, Plaintiff sent a letter to Laura Cubus, Manager of Distribution Operations ("Cubus letter").   Plaintiff describes the letter as a statement "concerning the questionable character of Tanya Binnert" and an expression of Plaintiff's "vehement opposition" to the appointment of Binnert to any kind of management position.   The letter, which consists of sixteen typed, single-spaced pages, describes Binnert's activities in minute detail and alleges various violations of Postal Service policy by Binnert dating back to 2006.   Specifically, Plaintiff alleges Binnert had been improperly selected for training and overtime opportunities in the previous two years and had confronted Plaintiff in the parking lot when she heard a rumor that Plaintiff had complained to management.   The letter also explains how the conflict with Binnert had inflicted a mental and physical toll upon Plaintiff.[4]

Bianchi and Frosino were tasked with investigating the letter.   Bianchi and Frosino compared the amount of overtime recorded by Binnert to the amount of overtime recorded by Plaintiff and other employees, which revealed no significant difference.   Bianchi testified that many of the other incidents described by Plaintiff "were old or didn't cause me concern."

On March 13, 2008, Plaintiff submitted a complaint to the Office of the Inspector General, United States Postal Service ("OIG Complaint").   The OIG Complaint is a longer and more detailed version of the Cubus letter.[5]   Again, Plaintiff includes detailed information about Binnert's schedule, overtime, work assignments, clothing,[6] and romantic life.   Plaintiff again accuses Binnert of violating various Postal Service policies and complains that management has done nothing to rectify the situation.

Despite Plaintiff's protests, Binnert was assigned to a temporary 204(b) management position.   On March 19, 2008, Plaintiff wrote a letter to Bianchi ("Bianchi letter") objecting to

---

[4]      In addition to aggravating Plaintiff's back injury, the stress of the conflict led to a recurring nightmare in which Binnert chases Plaintiff around with a knife "in the parking lot, in the plant, and in the bathtub."
[5]      In the OIG Complaint itself, which is twenty-eight pages, Plaintiff describes the Cubus letter as "the original condensed version of this letter."
[6]      Including, but not limited to, Binnert's Halloween costumes from 2005, 2006, and 2007.

Binnert's temporary assignment and updating the first two letters by describing how Plaintiff has been unable to avoid Binnert at work.  The letter describes Binnert's behavior as "harassment."

Between February and April 2008, Plaintiff underwent six counseling sessions with Mary C. Grant, Ph.D. ("Dr. Grant") to address this workplace conflict.  On May 9, 2008, Plaintiff's primary care physician, Carlos Jimenez-Rueda, M.D. ("Dr. Jimenez"), wrote to Elaine Tunaitis, M.D. ("Dr. Tunaitis"), who served as an Occupational Medical Physician with the Postal Service.  Dr. Jimenez wrote that Plaintiff was suffering from "a recurring episode of TMJ Syndrome anxiety and lower back pain brought on by a Traumatic Stress Syndrome, secondary to a long standing co-worker turbulent relationship."   Pursuant to Dr. Jimenez's recommendation, Plaintiff left work for several weeks.

In June 2008, Plaintiff requested an appointment with an EEOC Dispute Resolution Specialist and completed an Information for Pre-Complaint Counseling form.   In the Pre-Complaint, Plaintiff alleges she was illegally discriminated against when Frosino and Bianchi: (1) did not train Plaintiff for preferential assignments as an expediter in favor of four junior employees, including Binnert, and (2) failed to discipline Binnert for engaging in "many hostile confrontations" with Plaintiff.  However, Plaintiff voluntarily withdrew her Pre-Complaint on August 7, 2008.

On October 3, 2008, co-worker Cheryl Steinbacher[7] ("Steinbacher") wrote a statement to Bianchi complaining about Plaintiff's ongoing obsession with Binnert.  Steinbacher wrote that "Almost 90% of the plant employees has [sic] been subject to the rantings and ravings of Kathy Hanfland with regards to Tanya.  Her behavior is ridiculous and obsessive and we are tired of it!"  In addition, Steinbacher reported that "Kathy will wait in the parking lot until Tanya exits the building, almost nightly, and then leaves . . . .  Her intent is to make sure that Tanya is not

---

[7]      Steinbacher also worked as a Mail Clerk at the L&DC.

getting any extra overtime. This can be construed as stalking of sorts." Steinbacher concludes that "Management needs to address this issue again before it gets out of hand – I know for a fact that Tanya is becoming very concerned for her own safety."

Bianchi gave Steinbacher's statement to Frosino and directed him to investigate the matter. On October 10, 2008, Frosino met with Plaintiff for a preliminary disciplinary interview ("PDI"). In the meeting, Plaintiff insisted that it was her "right to watch Binnert's every move" and that she had to watch Binnert in order to avoid her as instructed. Plaintiff also asserted that she had a Constitutional right to question people at work, and demanded to know the names of any employees who wrote about her. Frosino responded that he could not release those names because he was still investigating the matter and no charges were being filed for now. Plaintiff also told Frosino that she was taking four different medications to cope with the stress and anxiety of working with Binnert. Frosino concluded the interview by instructing Plaintiff to stop discussing Binnert's business or any other aspect of this issue with others.

On October 12, 2008, Plaintiff approached Steinbacher at work to ask if she had written a statement "calling her a criminal." Plaintiff told Steinbacher she was going to hire an attorney to subpoena the statements in order to find out who wrote them. Plaintiff also questioned Hugh Jantz ("Jantz"), another mail clerk at the L&DC. Both Steinbacher and Jantz wrote statements to management complaining about Plaintiff's actions and asking that something be done about it. Jantz reported that Plaintiff "was asking all co-workers if they had written a statement." Binnert also wrote a statement in which she complained about Plaintiff confronting Steinbacher and Jantz and stated, "I don't wish [Plaintiff] to get in trouble for fear she may retaliate against me somehow, someway, but on the other hand this can't go on."

On October 14, 2008, Plaintiff wrote a letter to Lead Plant Manager Kathleen Burns ("Burns letter"). In the Burns letter, Plaintiff formally requests the removal of Binnert, Frosino,

and "any employee who has written a slanderous statement which defames and assassinates my character."

Based on the second round of employee complaints, Frosino met with Plaintiff for a second PDI on October 16, 2008. Again, Plaintiff claimed her right to watch Binnert, despite the 2007 order to keep away and the first PDI. Plaintiff also claimed she was entitled to question other employees about Binnert and about their complaints to management. Frosino concluded that the situation with Plaintiff was not going to resolve itself without further management intervention.

Also on October 16, 2008, Plaintiff wrote a six-page letter to Frosino ("Frosino letter") in which Plaintiff contests the two PDIs, questions why management believed Binnert's side of the story rather than hers, asserts her right to free speech, and describes again the physical and emotional toll the conflict has had on her. The Frosino letter also includes additional detailed accounts regarding Binnert's work hours and activities during work.

In response to an email from Frosino describing Plaintiff's first PDI, Bianchi organized a meeting of the Postal Service's Western District Threat Assessment Team ("TAT"). The purpose of the TAT is to assess potentially threatening situations and develop risk abatement plans that minimize the potential risk for violence in the workplace. At the time, the TAT consisted of Labor Relations Manager Gregory Filipski ("Filipski"), Director of Human Resources Judith Farrell ("Farrell"), Occupational Health Nurse Administrator Jane McNabb ("McNabb"), and Postal Investigator Raymond Williams. On October 16, 2008, the TAT[8] met to discuss the situation regarding Plaintiff. Ultimately, the TAT reached a consensus that Plaintiff should undergo a Fitness for Duty ("FFD") examination.

---

[8]      Joined on the phone by Bianchi.

On October 18, 2008, Frosino recommended that a disciplinary Letter of Warning ("LOW") be given to Plaintiff based on her insubordination during the two PDIs.   Labor Relations Specialist Richard Domis drafted a LOW, but Frosino ultimately decided against disciplinary action and therefore the letter was never issued to Plaintiff.

On October 23, 2008, Dr. Tunaitis examined Plaintiff.   After reviewing the relevant information and conducting an interview with Plaintiff, Dr. Tunaitis was concerned that Plaintiff may have "Delusionary Disorder – Persecutory type" but could not make a definitive diagnosis. Therefore, Dr. Tunaitis decided to refer Plaintiff to see a psychiatrist and concluded that Plaintiff should be considered "not fit for duty" in the meantime.

On October 27, 2008, Dr. Tunaitis engaged Dr. R.P. Singh ("Dr. Singh"), a local independent forensic psychiatrist, to evaluate Plaintiff.  Dr. Tunaitis asked Dr. Singh to examine Plaintiff "with the following questions in mind: (1) Does she have a psychiatric condition?  If so, what is her diagnosis? (2) Does she require treatment to safely attend work? Please consider safety for her co-workers and hostile environment issues. (3) If she refuses treatment, what recourses can you suggest?  If discipline is issued, will she adequately understand it, and can she control her actions to respond to it?  (4) Is there a risk of violence to self or others here? (5) Does she need to work in geographically separate facility from Ms. Binnert? (6) If she does, will issues resolve or is this likely to happen again with a different person?"  Also on October 27, 2008, Plaintiff was informed she had been placed on emergency off-duty, non-pay status[9] and directed to attend the follow-up FFD with Dr. Singh.

---

[9]       Plaintiff subsequently requested that she be placed on paid administrative leave rather than emergency off-duty status.  When her request was denied, Plaintiff filed a grievance regarding the decision.  On April 7, 2010, this grievance was settled with the understanding that Plaintiff would be paid administrative pay for the hours she was not in paid status.

Dr. Singh examined Plaintiff on November 10, 2008.  Dr. Singh also interviewed two of Plaintiff's supervisors, corresponded with Dr. Tunaitis and McNabb, interviewed Dr. Grant over the phone, and reviewed the documents provided by Dr. Tunaitis and Plaintiff.

On January 16, 2009, Dr. Singh reported his findings back to Dr. Tunaitis.  Dr. Singh determined that "Ms. Hanfland's fixed belief about being harassed by these coworkers and being discriminated against by her supervisors is close to being delusional in nature," that "[i]t is highly likely that Ms. Hanfland will continue to exhibit the same behavior she did prior to her being placed on medical leave," and that "[t]he treatment will take several months before it will become clear whether or not Ms. Hanfland will respond to treatment."  Although Dr. Singh did not believe that Plaintiff posed a present risk of harm to herself or others, he recommended that Plaintiff start therapy with Dr. Grant immediately and concluded that Plaintiff "is not fit to return to work unless she has started treatment with Dr. Grant and has had a few sessions with her."

On January 21, 2009, Plaintiff was cleared to return to work at the L&DC.

## 2.  Present Action

Plaintiff commenced this action on March 2, 2010, alleging sex discrimination, age discrimination, disability discrimination, and retaliation for engaging in protected activity.  ECF No. 1.  Plaintiff originally sought relief under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), the Civil Rights Act of 1964 as amended, 42 U.S.C. § 200e, *et seq.* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the New York State Human Rights Law, Executive Law § 290 ("NYSHRL"), NY CLS CPLR § 201, *et seq.* (2010).  By Stipulation and Order, the parties agreed to discontinue Plaintiff's NYSHRL claim with prejudice and to amend the Complaint such that Plaintiff's disability discrimination claim is alleged under the Rehabilitation Act of 1973, 29 USC § 794, *et seq.* ("Rehabilitation Act") rather than the ADA.  ECF No. 20.

Defendant previously moved for partial summary judgment, seeking dismissal of Plaintiff's claims under Title VII and the Rehabilitation Act regarding Postal Service management's alleged failure to train, failure to prevent harassment by Binnert towards Plaintiff, and failure to prevent Binnert from receiving preferential treatment. ECF No. 21. This Court granted Defendant's motion and dismissed such claims accordingly. ECF No. 70.

In the instant Motion for Summary Judgment, Defendant seeks dismissal of Plaintiff's remaining claims on multiple grounds: (1) claims regarding the Postal Service's employment actions occurring before November 2, 2008 were raised outside the 45-day time period in which to report EEO complaints and, as such, were not timely exhausted; (2) Plaintiff cannot state a *prima facie* claim of disability discrimination under the Rehabilitation Act because she was not regarded as disabled by her employer; (3) Plaintiff cannot state a *prima facie* case of illegal retaliation under Title VII because her managers did not know about her protected activity and there is no causal connection between the employment actions and the prior protected activity; (4) Plaintiff cannot establish a *prima facie* case of gender or age discrimination because she did not suffer any employment action that occurred under circumstances giving rise to an inference of discriminatory intent; (5) the PDIs, FFDs and LOW are not adverse employment actions; (6) Defendant can articulate a legitimate, neutral business reason for the employment actions at issue. ECF No. 55.

In response, Plaintiff argues (1) Defendant violated 42 U.S.C. § 12112(d)(4)(A) of the ADA by requiring her to undergo a medical examination; (2) Plaintiff has a triable case of hostile work environment based on sex; (3) Plaintiff has a triable case for retaliation. ECF No. 65.

For the following reasons, Defendant's Motion for Summary Judgment is granted.

## LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted).

When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). In order to establish a material issue of fact, the non-movant need only provide "sufficient evidence supporting the claimed factual dispute" such that a "jury or judge [is required] to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). If, after considering the evidence in the light most favorable to the non-moving party, the Court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *Scott*, 550 U.S. at 380 (citing *Matsushita*, 475 U.S. at 586-587).

## DISCUSSION

### 1.  Age Discrimination

Count I of Plaintiff's Complaint alleges age discrimination in violation of the ADEA.
ECF No. 1.  Defendant argues that Plaintiff has now abandoned her age discrimination claim,
and that summary judgment should therefore be granted.  ECF No. 69.  I agree.

"[F]ederal courts may deem a claim abandoned when a party moves for summary
judgment on one ground and the party opposing summary judgment fails to address the argument
in any way."  *Wecare Holdings, LLC v. Bedminster Int'l Ltd.*, No. 08-CV-6213, 2009 WL
604877, at *7-8 (W.D.N.Y. Mar. 9, 2009) (quoting *Taylor v. City of New York*, 269 F. Supp. 2d
68, 75 (E.D.N.Y. 2003)); *see also Davidson v. Desai*, 817 F. Supp. 2d 166, 187 (W.D.N.Y. 2011)
("Plaintiff's failure to oppose Defendants' motion seeking summary judgment on this claim, by
itself, gives the court reason to deem the claim abandoned.").

Here, Defendant raised various arguments in its Motion for Summary Judgment as to
why Plaintiff has failed to state a *prima facie* claim of age discrimination under the ADEA.  ECF
No. 55.  Plaintiff completely ignores these arguments in her Reply brief, and raises no arguments
of her own in opposition.  ECF No. 65.  Plaintiff has abandoned her age discrimination claim and
summary judgment is therefore granted as to that claim.

### 2.  Discrete Sex Discrimination Claims

Plaintiff has also abandoned her remaining[10] discrete sex discrimination claims.   In
Defendant's Motion for Summary Judgment, Defendant raises several arguments for dismissing

---

[10]    This court previously dismissed Plaintiff's Title VII sex discrimination claims regarding Postal Service
management's alleged failure to train, failure to prevent harassment by Binnert towards Plaintiff, and failure to
prevent Binnert from receiving preferential treatment.  ECF No. 70.  The remaining employment actions include: the
two PDIs, preparation of a later abandoned LOW, placement on administrative leave without pay, the preliminary
FFD examination, mandated psychological counseling, and the FFD examination with Dr. Singh.

the remainder of Plaintiff's discrete sex discrimination claims.[11]  ECF No. 55.  Plaintiff's brief in opposition ignores Defendant's arguments, and instead discusses an alleged hostile work environment.  ECF No. 65.  Summary judgment is therefore granted with respect to Plaintiff's remaining discrete sex discrimination claims.

### 3. Hostile Work Environment

To establish a hostile work environment claim under Title VII, a plaintiff must demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Although there is no precise or mathematical test available to determine whether a plaintiff suffered a hostile work environment, the incidents of discrimination "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).

Here, Plaintiff argues in opposition to summary judgment that a "continuing hostile work environment was caused by preferential treatment given by Defendant's male managers Bianchi and Frosino to a female coworker, Tanya Binnert, because of her gender."  ECF No. 65, at 24.  Plaintiff also states that "two similarly-situated male coworkers, Kyle Thomas and Timoteo LaFrance, were permitted to resolve alleged mental health issues with certification by their own healthcare providers, while Ms. Hanfland (female) was forced to undergo a psychiatric examination by USPS-contracted forensic psychiatrist and mandatory psychological counseling." *Id.*

---

[11]    Specifically, Defendant argues: (1) claims involving Postal Service actions before November 2, 2008 were not timely exhausted; (2) Plaintiff did not suffer any employment action that occurred under circumstances giving rise to an inference of discriminatory intent; (3) the PDIs, FFDs and LOW are not adverse employment actions; and (4) Defendant had legitimate, neutral business reasons for each employment action.

Plaintiff's hostile work environment claim regarding preferential treatment towards Binnert was dismissed in this Court's previous ruling.[12]  With respect to the way Postal Service management resolved Plaintiff's alleged mental health issues, Plaintiff has failed to show how the decision to order a psychiatric examination is part of a continuous and pervasive environment rather than a discrete and isolated event.  Plaintiff provides no argument for why any other employment action involved in this case, such the alleged preferential treatment towards Binnert, is in any way connected to the decision to resolve Plaintiff's mental health issues by ordering a psychiatric evaluation and mandating psychological counseling.

Summary judgment is therefore granted as to Plaintiff's hostile work environment claim.

## 4.  Disability Discrimination

Plaintiff's Complaint, as amended, alleges disability discrimination in violation of the Rehabilitation Act.  ECF No. 20.  The standards used to determine whether an employer has violated the Rehabilitation Act are the same as the standards applied under Title I of the ADA. 29 U.S.C. § 794(d).

Defendant's Motion for Summary Judgment focuses exclusively on the standards applied under 42 U.S.C. § 12112(a), the ADA's general prohibition against disability discrimination in employment.  ECF No. 55.  Plaintiff's response, however, invokes the prohibition against medical examinations and inquiries under § 12112(d)(4)(A).  ECF No. 65, at 11.

In Defendant's Reply in Support of Summary Judgment, Defendant argues that (1) Plaintiff's examination claim must be rejected because Defendant was never on notice that Plaintiff intended to pursue a claim under § 12112(d)(4)(A); and (2) the FFD examinations at

---

[12]     The grounds for this Court's decision were: (1) Plaintiff unequivocally waived her preferential treatment claim by withdrawing her Request for EEO Counseling; (2) Plaintiff failed to demonstrate that the relevant decisions by Postal Service managers were part of a continuing violation, rather than discrete and unrelated actions; (3) any hostile work environment claim that Plaintiff may have had was not timely exhausted.  ECF No. 70.

issue in this case were consistent with the business necessity exception to § 12112(d)(4)(A). ECF No. 69.

### a) Lack of Notice

Defendant's argument that Plaintiff's examination claim should be dismissed for lack of notice is unavailing. Although the first time Plaintiff cited § 12112(d)(4)(A) was in opposition to summary judgment, and the vast majority of ADA and Rehabilitation Act cases involve § 12112(a), Defendant does not argue that Plaintiff ever restricted herself to § 12112(a) or ruled out an examination claim during discovery. Indeed, the fact that FFD examinations were at the heart of Plaintiff's disability discrimination claim could not have come as a surprise to Defendant, because Defendant discusses the FFDs extensively in the instant Motion for Summary Judgment. ECF No. 55. Even though Defendant initially discussed Plaintiff's FFDs in the context of § 12112(a), Defendant's arguments remain relevant and were in fact re-cast in Defendant's Reply brief. Defendant does not argue that discovery needs to be reopened, or that Plaintiff's failure to cite § 12112(d)(4)(A) has in any way prejudiced its ability to litigate this case. The sufficiency of Plaintiff's examination claim must therefore be analyzed on its merits.

### b) Business Necessity Exception

Pursuant to § 12112(d)(4)(A), "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." Defendant argues that summary judgment should be granted because undisputed evidence establishes that Postal Service management's actions were "job-related and consistent with business necessity."

The Second Circuit has elaborated on the business necessity standard under § 12112(d)(4):

> in proving a business necessity, an employer must show more than that its inquiry is consistent with 'mere expediency.' An employer cannot simply demonstrate that an inquiry is convenient or beneficial to its business. Instead, the employer must first show that the asserted "business necessity" is vital to the business. For example, business necessities may include ensuring that the workplace is safe and secure or cutting down on egregious absenteeism. The employer must also show that the examination or inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary. The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal.

*Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 97-98 (2d Cir. 2003). Because

business necessity is an affirmative defense, Defendant bears the burden of proof. *Transp.*

*Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.*, 341 F. Supp. 2d

432, 446 (S.D.N.Y. 2004).

### (1) Vital Business Necessity

The first prong of a business necessity defense under § 12112(d)(4)(A) requires the

employer to present a business necessity that is "vital" to the employer's business, rather than

one that is merely convenient or beneficial. *Conroy*, 333 F.3d at 97.

Here, Defendant asserts that the general and psychiatric FFDs were initiated "to

determine whether Plaintiff could perform the essential elements of her job." ECF No. 69, at 5.

More specifically, Defendant intended "to determine whether Plaintiff experienced a mental

health issue that compromised her ability to work safely and cooperatively with her co-workers

and managers." *Id.* at 6. Because workplace safety is specifically listed as a sufficient business

necessity in *Conroy*, the first prong of the business necessity exception to § 12112(d)(4)(A) has

been satisfied.

### (2) Whether the FFD Examinations "Genuinely Served" the Business Necessity

The second prong of a business necessity defense under § 12112(d)(4)(A) requires     an

employer to show that the examination "genuinely serves" the asserted business necessity.  As

explained in *Conroy*, "[t]he employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal." *Id.* at 98.

Here, despite being ordered in August 2007 to keep her distance from Binnert, Plaintiff's detailed letters to management throughout 2008 displayed an ongoing fixation with Binnert's whereabouts and activities during work hours. The stress of this fixation was causing Plaintiff serious emotional and physical anguish, which ultimately led her to miss work for several weeks in May 2008.

When Plaintiff returned to work, however, the conflict between Plaintiff and Binnert spread to the rest of the office rather than abated. Steinbacher reported to Bianchi not only that she and others felt harassed because Plaintiff was forcing her obsession with Binnert on them, but also that Plaintiff had made a habit of waiting for Binnert in the parking lot after work.

When Plaintiff was told in her first PDI not to disrupt the office and not to track Binnert's movements, Plaintiff refused to cooperate. Instead, Plaintiff confronted Steinbacher, Jantz, and others in the office, demanding to know who complained about her to management and threatening to find out who did through legal action.

After another round of employee complaints, Plaintiff was called in for a second PDI. Again, Plaintiff claimed the right to track Binnert's activities and refused to cooperate. In the letter to Frosino responding to the two PDIs, Plaintiff again detailed how the situation had seriously affected her not only mentally but physically: "I have developed TMJ, a permanent condition, in my jaw and the stress of this daily situation has aggravated the degenerated disc in my back so much that it may require surgery."

Given this information, the TAT ordered Plaintiff to sit down with Dr. Tunaitis for an initial FFD examination. When Dr. Tunaitis believed that Plaintiff may be suffering from a

delusionary disorder but could not make a definitive diagnosis, she referred Plaintiff to a forensic psychiatrist.   After Dr. Singh examined Plaintiff and reviewed the relevant information, he concluded that Plaintiff should be required to participate in psychological counseling and that although Plaintiff was not a present threat to herself or others, she should only be allowed to return to work after she began her counseling program.

Plaintiff argues that a reasonable jury could find that the FFDs were overly intrusive and therefore did not genuinely serve the needs of Postal Service management.   In support, Plaintiff notes that (i) she worked a shift without incident after her first FFD; (ii) there was never any evidence Plaintiff engaged in an act of violence or threatened violence; (iii) Plaintiff was not permitted to present certifications by her own health care providers; and (iv) a LOW would have been a less intrusive means to resolve the situation.   ECF No. 65.

(i)      Working a Shift After the Initial FFD

The fact that Plaintiff worked one shift without incident after her initial FFD is insufficient to raise a triable issue of fact, given all the other information presented to the TAT. Further, the fact that this shift occurred *after* Plaintiff's first FFD means that it cannot support the argument that the first FFD itself was not warranted.   Even if Plaintiff could raise a triable issue with respect to her fitness for duty at the time the FFDs were ordered, Plaintiff's argument is derived from a mischaracterization of the inquiry at hand.   The question is not whether Plaintiff *in fact* was a threat to the safety of others or possessed the ability to perform the essential elements of her job, but whether Defendant had a sufficient basis to request an FFD exam *in order to determine* whether Plaintiff could perform her duties safely and cooperatively.

(ii)     Lack of Violence

Again, Plaintiff mischaracterizes the inquiry at hand by arguing that a triable issue is raised because Plaintiff never engaged in an act of violence or threatened violence. Given all the information presented to the TAT at the time, it would be unreasonable to require management to wait for an overt act of violence or threat of violence before further investigating the situation.

(iii)     Certification by Plaintiff's Health Care Providers

Plaintiff also argues she should have been allowed to present certifications by her own healthcare providers. But Plaintiff had been to therapy with her own providers in the past, and her disruptive behavior had continued. As the Second Circuit made it clear in *Conroy*, Defendant "need not show that the examination or inquiry is the only way of achieving a business necessity." *Conroy*, 333 F.3d at 98; *see also Rivera v. Smith*, No. 07-CV-3246-BSJ-AJP, 2009 WL 124968, at *4 fn.4 (S.D.N.Y. Jan. 20, 2009) (holding that an employer's decision to require an independent psychiatric examination was consistent with business necessity, despite the fact that plaintiff's health care provider had assessed him "fit to continue working"). No reasonable jury could find that Postal Service management was unjustified in ordering an independent examination.

(iv)     LOW as a Less Intrusive Means

Even assuming, for the sake of argument, that a disciplinary LOW could be interpreted as a "less intrusive" response to the situation faced by Postal Service management, Plaintiff has not presented any argument as to how exactly a disciplinary letter would have achieved management's goal of determining whether Plaintiff could work safely and cooperatively with her co-workers and management. The undisputed evidence in this case, even when viewed in the light most favorable to Plaintiff, indicates that a disciplinary letter would have been unlikely to accomplish that goal. Frosino had already attempted to resolve the conflict through disciplinary

17

procedures, both in 2007 when he told Plaintiff and Binnert to stay away from each other and in October 2008 when he called Plaintiff in for two separate PDIs. Plaintiff refused to cooperate, and consistently claimed a right to track Binnert's movements and activities.

In light of the evidence Postal Service management was presented with at the time, no reasonable jury could find that the FFDs were not a "reasonably effective method of achieving the employer's goal" in this situation. *Id.* Defendant's burden of showing that the FFDs genuinely served a vital business necessity has been met, and summary judgment is therefore granted as to Plaintiff's disability discrimination claim.

## 5. Retaliation

In her Complaint, Plaintiff alleges Defendant violated Title VII when management "retaliated against Plaintiff for her filing of prior claims of discrimination."[13] ECF No. 1, at 10.

To sustain a retaliation claim under Title VII, an employee must first establish a *prima facie* case by showing that (1) the employee engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action. *See, e.g., Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). To survive a motion for summary judgment, a plaintiff must present evidence sufficient to permit a rational finder of fact to infer a retaliatory motive. *Id.*

### a) Protected Activity

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 322 (E.D.N.Y. 2014) (quoting *Bryant v. Verizon Commc'ns, Inc.*, 550 F. Supp. 2d 513, 537

---

[13] Plaintiff also alleges in her Complaint that Defendant violated the ADA by retaliating against Plaintiff "because of her prior request for a reasonable accommodation." ECF No. 1, at 11. However, Plaintiff makes no further mention of a request for reasonable accommodation or makes any further argument that her retaliation claim is grounded in the ADA. The Court will therefore deem that claim abandoned.

(S.D.N.Y. 2008)).   While the quintessential example of protected activity is filing a formal complaint with an administrative agency such as the EEOC, informal protests of discriminatory employment practices (such as making complaints to management) may also be classified as protected activity. *Benedith*, 38 F. Supp. 3d at 322 (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).

To constitute protected activity, however, an informal complaint must include "sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, national origin, or any other characteristic protected by Title VII." *Lehman v. Bergmann Associates, Inc.*, 11 F. Supp. 3d 408, 417-18 (W.D.N.Y. 2014) (quoting *Brummell v. Webster Central School District*, No. 06-CV-6437, 2009 WL 232798, at *6 (W.D.N.Y. Jan. 29, 2009)).   "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." *Benedith*, 38 F. Supp. 3d at 322 (quoting *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009)); *see also Johnson v. City University of New York*, 48 F. Supp. 3d 572 (S.D.N.Y. 2014) ("For purposes of a Title VII retaliation claim, it is objectively unreasonable to believe that complaining about poor treatment in the workplace entirely unrelated to any trait, protected or otherwise, is a protected activity under Title VII.").

At the same time, the mere use of specific legal terminology is insufficient; a court "must look at the substance of [the] complaint, not the terminology that [the complainant] used." *Foster v. Humane Soc'y of Rochester & Monroe Cnty., Inc.*, 724 F. Supp. 2d 382, 395 (W.D.N.Y. 2010).

In *Brummell*, for example, summary judgment was granted as to the plaintiff's Title VII retaliation claim because plaintiff failed to allege she engaged in a protected activity.  2009 WL

232798, at *4-7.  Plaintiff's act of complaining to her male supervisor that "you treat me differently than you do other people around here" was insufficient as a matter of law, because "[a]t no time did [plaintiff] allege that she was being treated differently because she was a woman, or that [her supervisor] treated her or other women differently because of their gender." *Id.* at *5.

In *Lehman*, the plaintiff reported to her CEO that "she was the only Manager or Director being reprimanded for problems all of the Managers and Directors were having."  11 F. Supp. 3d at 417.  Even though plaintiff was the only female manager or director at the office, the court in *Lehman* held that plaintiff's complaint did not constitute protected activity because the court could not assume that the CEO assumed plaintiff was complaining of sex discrimination "based on the simple fact that she was the only female manager or director."  *Id.* ("Lehman does not allege, as she must, that she complained to Mitchell that she was being discriminated against *because of her sex*.") (emphasis in original).

In *Foster*, the plaintiff sent an email to her supervisor in which she stated that "it is beginning to feel like a hostile work environment" and detailing "three issues that make it a hostile environment."  724 F. Supp. 2d at 387.  Because two of those "issues" involved an ongoing personality conflict with another female coworker, and the third involved a donor to plaintiff's organization making decisions that should have been left to plaintiff, the court in *Foster* held that plaintiff had not complained of unlawful discrimination and therefore had not engaged in protected activity.  *Id.* at 395.

Here, Defendant admits that Plaintiff engaged in protected activity under Title VII when she filed three EEO claims during her tenure with the Postal service: (1) on November 4, 2005 regarding her termination as a letter carrier while assigned to another Postal Facility; (2) on June 20, 2008 alleging discrimination in training and work assignments but later withdrawn on August

7, 2008 without an investigation; and (3) on December 17, 2008 regarding the FFD examinations.

Plaintiff relies on the Cubus letter, OIG Complaint, Bianchi letter, Burns letter, and Frosino letter to form the basis of her retaliation claim.[14]   ECF No. 65, at 25-33.   But in these letters, Plaintiff never once asserts that she is complaining of unfair treatment due to her membership in a protected class or puts her supervisors on notice that she is alleging conduct made unlawful by Title VII.   None of these letters may properly be classified as protected activity.

### (1) Cubus Letter

The Cubus letter, in Plaintiff's own words, is a statement "concerning the questionable character of Tanya Binnert" and is meant to serve "as a letter of vehement opposition to any appointment of Tanya Binnert to a 204-B position or to any other management position." Plaintiff describes in detail various incidents in which Binnert allegedly violated Postal Service policy by arriving at work either too early or too late, confronting Plaintiff in a parking lot to argue about the distribution of overtime scanning opportunities within the office, and using comments about her personal life to gain sympathy from supervisors and ultimately receive beneficial treatment.   Nowhere in the sixteen typed, single-spaced pages of the Cubus letter does Plaintiff state that she has suffered unfair treatment due to her membership in a protected class.

---

[14]    Plaintiff does not provide any argument for classifying any of her letters as "protected activity."   In the relevant section of her brief, Plaintiff instead writes that "Defendant has conceded that Ms. Hanfland has met her burden on this point."   ECF No. 65, at 26.   Defendant does concede that the filing of Plaintiff's EEO complaints was protected activity.   But Defendant also clearly denies that Plaintiff's letters to her supervisors were protected activity.   ECF No. 55, at 13.   Plaintiff impliedly argues that the letters were protected activity by relying on those letters in attempting to satisfy the other prongs of her *prima facie* retaliation claim, but provides no substance in support of that argument.

### (2) OIG Complaint

The OIG Complaint is essentially a longer and more detailed version of the Cubus letter.[15]   Again, Plaintiff accuses Tanya Binnert of violating various Postal Service policies and complains that Postal Service management has done nothing to rectify the situation.   But Plaintiff never ties any of the alleged policy violations to a particular trait, let alone a trait protected under Title VII.

### (3) Bianchi Letter

The Bianchi letter was written by Plaintiff in response to Binnert being named to a temporary supervisor position, and updates the first two letters by describing how Plaintiff has been unable to avoid Binnert at work.   The letter describes Binnert's behavior as "harassment," but Plaintiff does not allege she has been harassed based on a classification protected under Title VII.

### (4) Burns Letter

In the Burns letter, Plaintiff formally requests the removal of Binnert due to her harassing behavior and Frosino due to his failure to rectify the situation.   The letter again uses the word "harassment," but cannot conceivably be considered protected activity under Title VII.

### (5) Frosino Letter

The Frosino letter contests Plaintiff's two PDIs, questions why management seems to believe Binnert's side of the story rather than Plaintiff's, asserts Plaintiff's right to free speech, and describes the physical and emotional toll the conflict has had on Plaintiff.   Like in the other letters, Plaintiff never indicates that she believes she has been unfairly treated on a basis protected by Title VII. The Frosino letter therefore cannot be considered protected activity under Title VII.

---

[15]      In the OIG Complaint itself, which is twenty-eight pages, Plaintiff describes the Cubus letter as "the original condensed version of this letter."

**b) Defendant's Knowledge of Plaintiff's Protected Activity**

To satisfy the second prong of a *prima facie* retaliation claim under Title VII, Plaintiff must show that Postal Service management was aware of Plaintiff's protected activity at the time of the alleged retaliation.   In this case, Plaintiff's protected activity consisted of the EEO Complaints she filed in November of 2005, June of 2008, and December of 2008.   Because the alleged retaliation occurred in October and November, 2008,[16] only the November 2005 and June 2008 EEO Complaints are relevant.

Defendant cites the depositions of Bianchi, Farrell, Frosino, McNabb, and Tunaitis in which each of them testified that they were unaware of Plaintiff's EEO activity.   ECF No. 55-5, Bianchi Dep., 94:18; Farrell Dep., 61:25; 77:3-11; Frosino Dep., 130-31; 156-57; McNabb Dep., 216:16-19; Dr. Tunaitis Dep., 142:7-10.   McNabb and Frosino also signed EEO Investigative Affidavits in which they stated they were not aware of Plaintiff's EEO activity.  *Id.*, McNabb EEO Investigative Affidavit, p.3, response to Question 1; Frosino EEO Investigative Affidavit, p.4, response to Questions 1-3.

With respect to Plaintiff's June 2008 EEO Complaint, Plaintiff presents no evidence or argument in opposition to the sworn testimony of Bianchi, Farrell, Frosino, McNabb, and Tunaitis.

With respect to Plaintiff's 2005 EEO Complaint, the only evidence Plaintiff presents in opposition is an email chain from January 20, 2009.   ECF No. 64-3, Pl. Ex. 68.   The original email, sent by Filipski, is labeled "Hanfland again" and states that Hanfland is scheduled to return to work the next day.  *Id.*   Bianchi responds that he will meet separately with Binnert and Plaintiff.  *Id.*   Farrell expresses skepticism that the meeting will last only one hour, to which Bianchi responds that "Teriann seemed to think it would take 20 minutes …"  *Id.*

---

[16]     The TAT decided on October 16, 2006 that an FFD was warranted.   Dr. Tunaitis examined Plaintiff on October 23, 2008.   Dr. Singh examined Plaintiff on November 10, 2008.

Plaintiff argues that because Plaintiff's 2005 EEO complaint was against Teriann Burke, this email chain creates a triable issue of fact as to whether Bianchi (and others) had knowledge of Plaintiff's 2005 EEO Complaint. This argument fails for two reasons. First, the email chain Plaintiff cites was from January 20, 2009, months *after* the alleged retaliation. Second, even viewing facts in the light most favorable to Plaintiff, no reasonable jury could conclude that Bianchi had knowledge of Plaintiff's 2005 EEO Complaint solely based on the fact Bianchi may have talked about Plaintiff, in 2009, to a coworker who happened to have been involved in the 2005 EEO Complaint. Plaintiff filed the 2005 EEO Complaint when she was working as a part-time flexible City Mail Carrier. The 2005 EEO Complaint involved a different Postal Facility, different people, and a completely unrelated set of facts.[17]

Because Plaintiff has failed to present a genuine issue of material fact regarding Defendant's knowledge of Plaintiff's EEO activity, Plaintiff cannot establish a *prima facie* case of retaliation. Summary judgment is therefore granted as to Plaintiff's retaliation claim.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (ECF No. 55) is GRANTED. Plaintiff's Complaint is dismissed with prejudice.

IT IS SO ORDERED.

Dated: October 15, 2015
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court

---

[17] The 2005 EEO Complaint involved an incident in which Plaintiff was accused of a safety violation for driving up a driveway without knowing if she would be able to turn around. Plaintiff alleged she was treated unfairly by three superiors, including Teriann Burke, because of her gender. ECF No. 55-3, Ex. 1.